### IN THE UNITED STATES DISTRICT COURT FOR THE
### EASTERN DISTRICT OF OKLAHOMA

SHAKAYLA DAVIS, as Personal Representative ) 
of the Estate of RICKY DAVIS, deceased, )
                              )
           Plaintiff, )
                              )
v. )       Case No. 22-CV-320-DES
                              )
CITY OF MUSKOGEE, OKLAHOMA; )
ROBERT "BOB" LYNCH; )
and JEREMY JENKINS, )
                              )
           Defendants. )

## OPINION AND ORDER

This matter comes before the Court on Defendant City of Muskogee's ("Defendant" or "the City") Motion for Summary Judgment and Brief in Support (Docket No. 43). On April 10, 2025, a Hearing on this Motion was held in which both counsel for Plaintiff and Defendant were given the opportunity to present oral argument. For the reasons set forth below, Defendant's Motion for Summary Judgment is GRANTED.

     I.        Background

Plaintiff's allegations stem from an incident where Ricky Davis ("Mr. Davis"), following a call to him accusing his minor daughter, Shalayna Davis, of stealing money and threatening imminent harm to her, drove to his daughter's location, called 9-1-1, and told the dispatcher that two women were assaulting his daughter. (Docket No. 2 at 4). Plaintiff alleges that when Mr. Davis arrived at the scene, his daughter was running down the street and got into his car. *Id.* at 5. Although Mr. Davis initially drove away, he returned to the scene to retrieve his daughter's purse and phone. *Id.* It was upon this return that Plaintiff alleges the same individuals who assaulted Mr. Davis's daughter began assaulting Mr. Davis and threatened to kill him and his family. *Id.* Plaintiff alleges

Mr. Davis had a concealed carry license, was carrying a firearm, and loudly told these individuals that he had a gun and warned them to get back. *Id.* It was at this point that Officer Robert Lynch ("Officer Lynch") from Muskogee Police Department arrived[1] and told Mr. Davis to "drop the gun!", which Mr. Davis did. *Id.* Officer Lynch then told Mr. Davis to "get on the ground!" *Id.*

Plaintiff alleges, this order to "get on the ground" caused Mr. Davis to pause. In September 2017, Plaintiff alleges Mr. Davis underwent a kidney transplant procedure that required extended hospitalization. *Id.* at 3. In October 2017, Plaintiff further alleges Mr. Davis was injured in a car accident that caused a kidney infection and required another surgery. *Id.* Plaintiff alleges, due to his "history of dialysis, injections and IVs in his left forearm" an AV fistula and shunt was placed in Mr. Davis's forearm in March 2018. *Id* at 4. Once Officer Lynch ordered Mr. Davis to "get on the ground," Plaintiff alleges Mr. Davis said he could not get on the ground "due to his kidney transplant," to which Officer Lynch responded he did not care and repeated his command for Mr. Davis to get on the ground. *Id.* at 5-6. Plaintiff alleges Mr. Davis was fearful of being shot so he got on the ground. *Id.* at 6. At this point, Sergeant Jenkins arrived on the scene and he and Officer Lynch proceeded to handcuff Mr. Davis. *Id.* Plaintiff alleges Mr. Davis told the officers that he could not have his left arm cuffed behind his back because it was restricted with medical devices and because he had a kidney transplant. *Id.* Plaintiff alleges Sergeant Jenkins placed Mr. Davis inside a squad car with his arms cuffed behind his back, which caused more pain and pressure on the AV fistula and shunt. *Id.* at 7. Plaintiff alleges Mr. Davis had difficulty breathing because the squad car had no air conditioning. *Id.* After approximately forty-five (45) minutes, Plaintiff alleges Mr. Davis was allowed to get out of the squad car and his handcuffs were removed. *Id.* Plaintiff alleges Mr. Davis's AV fistula was "visibly swollen, disfigured and protruding from his arm" and

---

[1] Plaintiff disputes that Mr. Davis was pointing or waiving his gun at anyone on the scene, however, the body camera footage shows Mr. Davis was waiving his gun around as Officer Lynch arrived on the scene.

that an EMT spoke to Mr. Davis about his medical history and looked at his left arm. *Id.* Plaintiff alleges Mr. Davis returned home but presented to the hospital later that evening due to arm swelling and significant pain. *Id.* It was later determined that the AV fistula in his left arm had "burst . . . . requiring[ing] additional invasive surgical intervention to repair the damaged fistula and further hospitalization." *Id.*

Plaintiff, Shakayla Davis, daughter of Mr. Davis and Personal Representative of the Estate of Ricky Davis, filed this action on November 15, 2022 alleging: (1) excessive use of force in violation of the Fourth and/or Fourteenth Amendment and 42 U.S.C. § 1983 against all Defendants, (2) negligence against Defendant City of Muskogee, (3) violation of the Americans with Disabilities Act ("ADA") against all Defendants, and (4) deliberate indifference to a serious medical need in violation of the Fourteenth Amendment and 42 U.S.C. § 1983 against all Defendants. (Docket No. 2).

II.    Defendants' Statement of Material Facts and Plaintiff's Responses

On September 19, 2024, Officer Lynch filed his Motion for Summary Judgment ("MSJ") including a list of forty-one (41) material undisputed facts ("MUFS") pursuant to LCvR 56.1(b). (Docket No. 41). On the same day, Defendant City of Muskogee filed its own Motion for Summary Judgment and adopted all the MUFS included in Officer Lynch's MSJ. (Docket No. 43 at 9). Defendants' MUFS No. 4 indicates, Officer Lynch was dispatched to a disturbance where he encountered "a chaotic scene with a crowd of people yelling and screaming at each other with someone holding a stick and swinging it about as a weapon." (Docket No. 41 at 13). Officer Lynch drew his taser and stated, "hey, hey, drop it, drop it right now." *Id.* The crowd continued to yell and scream at each other, so Officer Lynch ordered them to "shut up! be quiet, be quiet." *Id.* But despite his orders, the crowd continued to yell and scream at each other." *Id.* While Plaintiff admits

Defendants' MUFS No. 4, she provides her own additional facts regarding the activities that occurred prior to police arriving on the scene. (Docket No. 50 at 5).

Defendants' MUFS No. 5 indicates Officer Lynch then saw Mr. Davis with a gun in his right hand, which he moved in an upward motion at a woman standing inches from him. (Docket No. 41 at 13). He instructed Mr. Davis to "Hey! Hey! put that – drop that gun! drop the gun now!" *Id.* Mr. Davis did not comply right away, so Officer Lynch again stated "drop the gun now! Drop the gun now!" *Id.* Plaintiff denies that Mr. Davis "ever pointed his gun at anyone." (Docket No. 50 at 5). Plaintiff further disputes that Mr. Davis did not comply with Officer Lynch's order to drop the gun, claiming that he complied within 3 seconds of such order. *Id.* Plaintiff further claims that prior to dropping the gun, Mr. Davis "removed the magazine or clip." *Id.* Defendants' MUFS No. 6 states Officer Lynch additionally ordered Mr. Davis to "Get on the ground! Get on the ground! Get on the ground now." (Docket No. 41 at 13). "Mr. Davis then got on the ground, flat on his stomach with his upper body off the ground supported by the weight of his arms as he laid there without saying anything as Officer Lynch was trying to get control of the situation." *Id.* Defendants' MUFS Nos. 7-9 indicate, while officer Lynch was dealing with the other individuals on the scene, additional officers including Sergeant Jenkins arrived. *Id.* at 14. Defendants' MUFS No. 10 stated, Mr. Davis, while still laying on the ground, shifted his weight on his left side and leaned up with his right side to speak with the officers who were standing next to him. *Id.* at 5-6. Plaintiff disputes this recitation of facts and claims instead that Mr. Davis was "holding his head up and evenly balancing himself with both elbows." (Docket No. 50 at 6). Mr. Davis only raised his right hand for "approximately 2 seconds, while putting weight on his left elbow." *Id.*

Defendants' MUFS No. 11 states that Sergeant Jenkins approached Mr. Davis who rolled flat on his stomach while Sergeant Jenkins "calmly ordered him, 'put your hands behind your

back.'" (Docket No. 41 at 15). Mr. Davis then "shift[ed] his weight to his right side and put his left arm behind his back to be handcuffed and then put his right arm behind his back and rolled to his right side while Sergeant Jenkins handcuffed him." *Id.* Plaintiff disputes the suggestions that Sergeant Jenkins was clam or professional in his dealings with Mr. Davis. (Docket No. 50 at 6). She further argues (even though Defendants' MUFS No. 11 did not address this) that from Sergeant Jenkins' body camera footage, a mass on Mr. Davis's wrist is seen while Sergeant Jenkins places handcuffs, and while there is no audio on Sergeant Jenkins' body camera footage, Sergeant Jenkins can be seen "touch[ing] the mass on Mr. Davis's left wrist and pull[ing] back on it." *Id.* Plaintiff argues this is proof that Sergeant Jenkins was aware of Mr. Davis's AV fistula. *Id.* Defendants' MUFS No. 14 states, "[o]nce the handcuffs were on Mr. Davis, Sergeant Jenkins allowed him to continue to lay on his right side, although the others on the ground were lying flat, while Sergeant Jenkins put his fingers in between the handcuffs to make sure they were loose on Mr. Davis and then he double locked them to ensure they would not tighten up on him. Although Mr. Davis had a fistula in his arm due to his kidney transplant, this was unknown to Sergeant Jenkins as you could not see it from the back of his arm and Mr. Davis said nothing about having a fistula in his arm that needed to be protected. He only informed Sergeant Jenkins, 'Man, I got a kidney transplant.' Sergeant Jenkins did notice something on Mr. Davis's left forearm but he believed it to be a cyst, or a deformity of some kind, or a growth, or an abnormality between his elbow and forearm. Mr. Davis said nothing to him or anyone else around that it was a fistula that needed to be protected." (Docket No. 41 at 15-16). Plaintiff disputes Defendants' MUFS No. 14 other than that Mr. Davis told Sergeant Jenkins that he had a kidney transplant to which Sergeant Jenkins replied, "I don't care, I'm not touching your damn kidney." (Docket No. 50 at 7).

Defendants' MUFS No. 18 indicates, Officer Lynch then assisted Sergeant Jenkins in lifting Mr. Davis from the ground into a standing position. (Docket No. 41 at 17). While not overtly stated in Defendants' MUFS No. 18, Plaintiff denies "the suggestion that Sergeant Jenkins and Officer Lynch caused no damage to Mr. Davis when they lifted him up off the pavement." (Docket No. 50 at 7). Defendants' MUFS No. 19 states, Mr. Davis told Sergeant Jenkins he could not sit on his back in the car due to his "kidney transplant," to which Sergeant Jenkins responded, "well you can sit in there sideways or something." (Docket No. 41 at 17). Defendants' MUFS No. 21 indicates, Mr. Davis requested his handcuffs be moved from behind him to his front, to which Sergeant Jenkins responded, "[w]e can't do that." *Id.* at 17-18. Defendants' MUFS No. 23 indicates, while Mr. Davis did tell Sergeant Jenkins that he could not put his arms behind his back, he did not tell Sergeant Jenkins why. *Id.* at 18. Plaintiff, in response, "denies the suggestion that Mr. Davis was required, under the circumstances, to explain why he couldn't have his arms behind him." (Docket No. 50 at 8). She also argues that Sergeant Jenkins "already knew that Mr. Davis: (A) had kidney transplant; and (B) had a fistula in his wrist or forearm." *Id.* Defendants' MUFS No. 25 states, after sitting in a patrol car for approximately seven minutes Mr. Davis told another officer on scene, Officer Bemo, that he "had renal failure, had a kidney transplant, and that he needed some water." (Docket No. 41 at 18). Officer Bemo requested an ambulance to come check on Mr. Davis. *Id.* Plaintiff admits the facts contained in Defendants' MUFS No. 25 but adds that while asking for water, Mr. Davis was in obvious distress and "had genuine panic in [his] voice" to which "Officer Bemo[2] was utterly dismissive." (Docket No. 50 at 8).

Defendants' MUFS No. 26 states, "[a]t approximately eight minutes after having been put into the patrol car, Mr. Davis (for the first time) announced only to Officer Bemo, 'I've got that

---

[2] Officer Bemo is not a named Defendant. Plaintiff does not allege any claims against him.

fistula on my arm and you ain't supposed to have nothing on there. You ain't supposed to have nothing restricting it . . .'" (Docket No. 41 at 19). Plaintiff only "disputes the assertion that Bemo was the first officer who Mr. Davis notified of his fistula." (Docket No. 50 at 9). Defendants' MUFS No. 27 indicates that Officer Bemo explained to Mr. Davis why he had to be handcuffed, which Mr. Davis seemed to understand, stating, "I know, give me water, I'm fine with the handcuffs, just give me some water." (Docket No. 41 at 19). Plaintiff admits this MUFS but indicates that it omits pertinent facts. (Docket No. 50 at 9).

Defendants' MUFS No. 32 indicates "Mr. Davis then stated to Officer Bemo regarding his handcuffs, 'I need this thing off my wrist.'" (Docket No. 41 at 20). Officer Bemo, having determined what had happened and being assured that Mr. Davis was not a threat, responded, "can – can you sit down if I take them off?" *Id.* Mr. Davis agreed, and Officer Bemo patted him down for officer safety and removed the handcuffs. *Id.* Mr. Davis stated, ***"I need water more than anything, sir."*** *Id.* Officer Bemo then asked another officer to get Mr. Davis's bottled water out of his car, although he did ask Mr. Davis, "ain't nothing crazy in it, is there?" Mr. Davis responded that he "can't take no crazy stuff. I got a kidney transplant." *Id.* The other officer brought Mr. Davis his bottled water and Mr. Davis continued to explain what happened at the scene. *Id.* Officer Bemo informed dispatch that Mr. Davis has "some kidney issues. He said he just needed some water . . ." *Id.* Again, Plaintiff admits this MUFS is factually correct but indicates that it omits pertinent facts. (Docket No. 50 at 9).

Defendants' MUFS No. 34 states that EMS personnel asked Mr. Davis if he wanted to go to the hospital multiple times and he responded, "I'm okay. I just had ten minutes to release this arm." "I'm okay man. I just had to sit here for a few minutes. I'm okay." (Docket No. 41 at 21). When EMS asked Mr. Davis if he was hurt, Mr. Davis responded, "I just need – I just got too

sweaty and I told him I can't (unintelligible). . . . I said, you can't put no cuffs on me. I'm not – no threat. And he kept on putting them behind my back anyway." *Id.* Plaintiff "vehemently disputes" the assertion that Mr. Davis did not tell Sergeant Jenkins that he had a fistula on his arm and only told him he was "not a threat." (Docket No. 50 at 10). Plaintiff further disputes that Mr. Davis made no medical complaints to EMS, and notes that body camera footage shows the "fistula on Mr. Davis's left arm was obviously and extremely swollen." *Id.* Defendants' MUFS No. 35 indicates that while Mr. Davis refused medical treatment or to be taken to the hospital at the scene, he did present at Wagoner Community Hospital emergency room later that evening. *Id.* Medical records indicate he had "minor abrasions to his knee and wrists and soft tissue swelling at his fistula." (Docket No. 41 at 21). Defendants' MUFS No. 35 further states that "Mr. Davis's past medical records show that Plaintiff's fistula was inserted in 2014. [S]ix months before this incident Mr. Davis had undergone a fistulagram to widen the artery due to stenosis . . . . The medical records reflect that at that time he was 'not using the fistula now due to his renal transplant one year ago.' Following the incident, on September 24, 2018, Plaintiff underwent the same procedure again due to the stenosis in his artery. Thereafter, he had several fistulagrams and eventually had the fistula removed since it was not necessary, due to his functioning kidneys." *Id.* Plaintiff "disputes any suggestion that Mr. Davis's subsequent procedures on the fistula were unrelated to the use[ ] of police force on September 18, 2018"; however, rather than citing to any medical records, Plaintiff references Mr. Davis's own verified answers to interrogatories and photographs as evidence. (Docket No. 51 at 10). Plaintiff does reference Mr. Davis's medical records in her "Additional Facts Precluding Summary Judgment" where she notes, "Mr. Davis presented to Wagoner County Community Hospital complaining that 'he was handcuffed by Muskogee Police and handcuff to left wrist caused fistula to swell and become painful.'. . . A physical examination

at the hospital showed that Mr. Davis's left forearm was 'tender with fistula in place obvious thrill'[3] and 'left knee with multiple abrasions . . .'" *Id.* at 12.

Defendants' MUFS No. 39 indicates that Mr. Davis never told Sergeant Jenkins he had an arm fistula or medical device that could not be restricted, and Sergeant Jenkins "believed that Mr. Davis had a cyst or other abnormality or deformity on his arm." (Docket No. 41 at 22). Plaintiff specifically disputes this assertion. (Docket No. 50 at 10). Defendants' MUFS No. 40 states, "Mr. Davis was in handcuffs for a total of fifteen minutes and fifteen seconds." (Docket No. 41 at 22). Plaintiff does not dispute Defendants' MUFS No. 40. (Docket No. 50 at 11).

III.    Analysis

Under Fed. R. Civ. P. 56(a), summary judgment is appropriate only if the moving party demonstrates that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law.  A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). The moving party bears the initial burden of showing the absence of a genuine issue of material fact, and the Court draws all reasonable inferences in favor of the nonmovant. *Georgelas v. Desert Hill Ventures, Inc.,* 45 F.4th 1193, 1197 (10th Cir. 2022). The nonmovant must then make a showing sufficient to establish an inference of the existence of each element essential to his case. *Bolden v. PRC, In*c., 43 F.3d 545, 548 (10th Cir. 1994). "If a party that would bear the burden of persuasion at trial does not come forward with sufficient evidence on an essential element of its prima facie case, all issues concerning all other elements of the claim

---

[3] A correctly functioning fistula has a bruit (a pulse that you can hear) and a thrill (a pulse that can be felt). A bruit and thrill are normal findings in a healthy fistula and indicate blood flow. Patients are instructed to consult a physician immediately if either the bruit or thrill appear reduced or absent. *See* https://www.azuravascularcare.com/infodialysisaccess/what-is-a-dialysis-fistula-bruit/ (last visited April 25, 2025).

and any defenses become immaterial," and the moving party is entitled to summary judgment. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671(10th Cir. 1998).

      A.  *Monell* Liability against the City

Plaintiff alleges that the City failed to adequately train and supervise its officers, including Officer Lynch and Sergeant Jenkins, with respect to: the arrest of and use of police force on citizens with a disability; providing reasonable accommodations for disabled arrestees/detainees; the arrest of and use of police force on citizens with significant injuries/medical conditions; the use of force continuum as it pertains to citizens like Mr. Davis; and proper handcuffing technique for citizens with known injuries, disabilities, or medical conditions. (Docket No 2. at ¶ 55). Furthermore, Plaintiff alleges there is an established and unabated pattern of excessive use of police force by the Muskogee Police Department ("MPD") evincing a municipal "custom." *Id.* at ¶ 56. The City argues, other than conclusory statements, Plaintiff fails to make a showing to support her claims against the City for either theory. (Docket No. 43 at 2). The Court agrees.

To establish municipal liability under § 1983, a plaintiff must show (1) the existence of a municipal policy or custom, and (2) that there is a direct causal link between the policy or custom and the injury alleged. *Hinton v. City of Elwood, Kan*., 997 F.2d 774, 782 (10th Cir. 1993). A municipality may not be held liable for the actions of its officers if those actions do not constitute a violation of a plaintiff's constitutional rights. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Apodaca v. Rio Arriba County Sheriff's Dept*., 905 F.2d 1445, 1447–48 (10th Cir. 1990); *Watson v. City of Kansas City*, 857 F.2d 690, 697 (10th Cir. 1988). Both Officer Lynch and Sergeant Jenkins filed individual Motions for Summary Judgment. (See Docket Nos. 41 and 42). In her Response to Officer Lynch's Motion for Summary Judgment, Plaintiff disputes many of Material Facts presented in Officer Lynch's motion, but ultimately does not contest Officer Lynch's claim

that he is entitled to judgment as a matter of law[4]. (Docket No. 58). Plaintiff fully responded to Defendant Jenkins' Motion for Summary Judgment, arguing that Defendant Jenkins' actions when handcuffing Mr. Davis and placing him into a patrol vehicle constituted excessive force in violation of Mr. Davis's Fourth Amendment rights. (Docket No. 50). Furthermore, Plaintiff argued Defendant Jenkins was deliberately indifferent to Mr. Davis's serious medical condition. Upon analysis of the evidence presented, the Court found that reviewing the facts and evidence in a light most favorable to the Plaintiff, Plaintiff failed to present evidence for which a reasonable jury could find Defendant Jenkins violated Mr. Davis's constitutional rights and, as such, Defendant Jenkins was entitled to summary judgment and qualified immunity. (Docket No. 74).

Finding no constitutional violations by Officer Lynch or Sergeant Jenkins, the Court will look to the remaining evidence regarding other City officers involved in this matter. The only other officer whose actions are implicated in Plaintiff's allegations is Officer Bemo. Plaintiff alleges that Officer Bemo knew Mr. Davis had a medical condition that required reasonable accommodations and Officer Bemo failed to make those accommodations, therefore knowingly disregarding a substantial risk to Mr. Davis's  health and safety, in violation of the Fourteenth Amendment. (Docket No. 51 at 13).  The Court does not agree.

The evidence presented shows that after Mr. Davis was handcuffed, he was placed in Officer Bemo's patrol car while officers on the scene conducted an investigation. (Docket No. 41-10 at 2-10). Officer Bemo returned to his patrol car approximately seven minutes after Mr. Davis was initially placed inside.[5] (Docket No. 41 at 9). Upon his return, Mr. Davis first told Officer Bemo, "I've got renal failure. I just had a kidney transplant. I need some water quick. Hurry up!

---

[4] Based on Plaintiff Response, the Court granted Defendant Lynch's Motion for Summary Judgment. (See Docket No. 73).

[5] Plaintiff does not dispute this fact.

Please!". (Docket No. 41-10 at 12). Officer Bemo responded by asking Mr. Davis if he needed an ambulance, then spoke to another officer attempting to get an ambulance for Mr. Davis. *Id.* Mr. Davis then requests water again and tells Officer Bemo that there is some in his car. *Id.* Officer Bemo conveys this request and information to another officer. *Id.* at 13. Mr. Davis then tells Officer Bemo, "I've got that fistula on my arm and you ain't supposed to have nothing on there. You ain't supposed to have nothing restricting it." *Id.* Officer Bemo replied, "You've got what?" at which time Mr. Davis again stated, "I have a fistula on my arm." *Id.*

To establish Officer Bemo violated the Fourteenth Amendment and was deliberately indifferent to Mr. Davis's serious medical needs, Plaintiff must show that Officer Bemo "failed to act despite his knowledge of a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). In other words, Officer Bemo "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (quoting *Farmer,* 511 U.S. at 837). There is no evidence presented in the record that Officer Bemo knew what a fistula was or knew that it could pose a substantial risk of harm.

What is in the record and what both parties agree to is that "Officer Bemo informed [Mr. Davis] that 'we're having an ambulance come over here and they'll deal with this.' Then Mr. Davis began telling Officer Bemo about the incident that took place which caused the disturbance. After this, which was less than two minutes after Officer Bemo arrived and opened the car door, . . . Mr. Davis requested that the air be turned on and he be left in the car rather than getting out as follows: Officer Bemo stated 'well, come out of there because all of this heat right here' and Mr. Davis responded: 'if you could turn the air on, that'd be better.'"[6] (Docket No. 41 at 19-20). "Officer

---

[6] These facts were presented as Defendants' Material Undisputed Fact No. 29, which Plaintiff expressly admitted. (Docket No. 51 at 5).

Bemo allowed Mr. Davis to come out of the car and told Mr. Davis to 'have a seat right here on the sidewalk.' Mr. Davis responded, 'I can't sit on the ground. I can sit on the car' as he begins to lean up against the back of a patrol car. Officer Bemo responded, 'well, yeah --- yeah, you can do that.'"[7] *Id.* at 20. "Mr. Davis then stated to Officer Bemo regarding his handcuffs, 'I need this thing off my wrist.' Officer Bemo, having determined what had happened and being assured that Mr. Davis was not a threat, . . . responded, 'can – can you sit down if I take them off?' Mr. Davis agreed, and Officer Bemo patted him down for officer safety and then took the handcuffs off. Mr. Davis stated, 'I need water more than anything, sir.' Officer Bemo then asked another officer to get Mr. Davis's bottled water out of his car, although he did ask Mr. Davis, 'ain't nothing crazy in it, is there?' Mr. Davis responded that he 'can't take no crazy stuff. I got a kidney transplant.' The other officer brought Mr. Davis his bottled water. Mr. Davis continued to explain what happened at the scene. Officer Bemo informs dispatch, 'he's got some kidney issues. He said he just needed some water . . .'"[8] *Id.* Mr. Davis was then seen by EMS personnel. (Docket No. 41-10 at 22).

There is nothing in the evidence before the Court that shows Officer Bemo disregarded a substantial risk to Mr. Davis's health and safety. In fact, the evidence shows that Officer Bemo requested an ambulance for Mr. Davis, ensured Mr. Davis received water, allowed him to exit the hot patrol car so that he could have some air, and permitted him to lean on the patrol car rather than sit on the sidewalk. Ultimately, after hearing Mr. Davis's account of the events, Officer Bemo removed Mr. Davis's handcuffs. Plaintiff fails to show that Officer Bemo failed to act despite his knowledge of a substantial risk of serious harm. Officer Bemo <u>did</u> act regarding Mr. Davis's

---

[7] These facts were presented as Defendants' Material Undisputed Fact No. 30, which Plaintiff expressly admitted. (Docket No. 51 at 5).

[8] These facts were presented as Defendants' Material Undisputed Fact No. 32, which Plaintiff expressly admitted, but noting that Defendant omitted several pertinent facts. (Docket No. 51 at 6).

complaints. While Plaintiff argues that Officer Bemo knew, or it was obvious, that Mr. Davis had a medical condition that required reasonable accommodations, Plaintiff fails to present evidence to support this statement. (Docket No. 51 at 13). Just like with Sergeant Jenkins, there is nothing in the record to suggest that Officer Bemo knew what an AV fistula was or its implications. Mr. Davis told Officer Bemo that the fistula cannot be restricted, but Officer Bemo noted that the handcuffs were not on the fistula, they were instead "down by [his] hands." (Docket No. 41-10 at 16). Because nothing in the record supports a Fourteenth Amendment violation claim of deliberate indifference by any officer against Mr. Davis, the City is entitled to summary judgment as to Plaintiff's claims of *Monell* Liability.

B. Negligence against the City

In addition to constitutional violation claims, Plaintiff alleges a state law negligence claim against the City. (Docket No. 2 at 13-14). Plaintiff's state law negligence claim is governed by the Oklahoma Governmental Tort Claims Act ("OGTCA"), which is the exclusive remedy by which an injured plaintiff may recover against an Oklahoma governmental entity for its torts and the torts of its employees. *Fuller v. Odom*, 741 P.2d 449, 451-53 (Okla. 1987); see also Okla. Stat. tit. 51, § 153(B). The OGTCA adopts and reaffirms the sovereign immunity of the state, its political subdivisions, and all employees acting within the scope of their employment. Okla. Stat. tit. 51, § 152.1(A). To succeed on her negligence claim, Plaintiff must prove: (1) the existence of a duty on the part of a defendant to protect the plaintiff from injury; (2) a violation of that duty; and (3) injury proximately resulting from the violation. *Tomlinson v. Love's Country Stores, Inc.*, 854 P.2d 910, 915 (Okla. 1993). Plaintiff argues the evidence establishes Sergeant Jenkins and Officer Bemo acted with intentional or reckless failure to accommodate Mr. Davis's disability and deliberate indifference to his serious medical needs. (Docket No. 51 at 13). Plaintiff argues, "[a]t a minimum,

Jenkins and Bemo treated Mr. Davis with negligence. And he was injured as a proximate cause of that negligence." *Id.* However, Plaintiff presents no evidence to support this statement. First, as noted in the Opinion and Order granting Sergeant Jenkins' Motion for Summary Judgment, Sergeant Jenkins was not deliberately indifferent to Mr. Davis's medical conditions that he was aware of. (Docket No. 73 at 15-16). Additionally, Officer Bemo was not deliberately indifferent towards Mr. Davis. In fact, officer Bemo took actions to address Mr. Davis's medical needs, including requesting an ambulance, providing water, removing Mr. Davis from the hot patrol car, and allowing him to lean on the patrol car. Finally, Plaintiff has not established that Mr. Davis was injured as a result of the Defendants' actions.

Plaintiff additionally makes a specific claim for negligent use of excessive force against the City for the actions of Sergeant Jenkins. As noted in the Opinion and Order granting Sergeant Jenkins' Motion for Summary Judgment, Sergeant Jenkins' actions in handcuffing Mr. Davis were objectively reasonable under the circumstances and not excessive. (Docket No. 74 at 10-14). Accordingly, the City is entitled to summary judgment as to Plaintiff's negligence claims.

### C. Violations of the Americans with Disabilities Act ("ADA")

Plaintiff further claims Defendant violated Mr. Davis's statutory rights under Title II of the ADA by the officers' failure to reasonably accommodate Mr. Davis's disabilities during their investigation causing him to suffer greater injury or indignity. (See Docket No. 2 at 15-16). Title II of the ADA states, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  In order to succeed on Plaintiff's claim for ADA violations,  Plaintiff must prove that: (1) Mr. Davis was a qualified individual with a disability; (2) Mr. Davis was either excluded from participating in or

denied the benefits of some public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of Mr. Davis's disability. *Crane v. Utah Dept. of Corrections*, 15 F.4th 1296, 1312 (10th Cir. 2021). "Courts have recognized three ways to establish a discrimination claim: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *J.V. v. Albuquerque Pub. Sch*., 813 F.3d 1289, 1295 (10th Cir. 2016) (citations omitted).

Plaintiff specifically claims Officer Bemo and Sergeant Jenkins failed to make reasonable accommodations for his disabilities during their investigative detention of him. (Docket No. 2 at 15-16, Docket No. 51 at 9-11). "A public entity must provide a reasonable accommodation under the ADA when it knows that the individual is disabled and requires an accommodation of some kind to participate in or receive the benefits of its services." *J.V.*, 813 F.3d at 1299 (internal quotation marks omitted). Plaintiff argues that "Mr. Davis repeatedly requested accommodation in not being handcuffed at all, being handcuffed in the front of his body and not being forced to sit in a squad car [ ] while cuffed behind his back. The reason for these requests was obvious." (Docket No. 51 at 10). While the evidence shows the officers knew Mr. Davis had a kidney transplant, the evidence also shows that the officers made reasonable accommodations to him based on this knowledge.[9] Furthermore, Plaintiff does not allege any injury to Mr. Davis's kidney as a result of the handcuffing.

As for Mr. Davis's AV fistula, the record is not clear as to whether Sergeant Jenkins knew Mr. Davis had an AV fistula on his arm, however, there is nothing in the record that to suggest that Sergeant Jenkins knew what an AV fistula was and knew that handcuffing Mr. Davis could pose

---

[9] Sergeant Jenkins allowed Mr. Davis to lay on his side while handcuffed, assisted him in getting up, helped him into a patrol car, and told him he could sit sideways for his comfort. (Docket No. 42 at 7).

a risk of exacerbating Mr. Davis's medical condition. As such, there is nothing in the record to show that Sergeant Jenkins knew of Mr. Davis's disability or knew that Mr. Davis required an accommodation for it. The record does show that Mr. Davis specifically told Officer Bemo that he had a fistula on his arm that could not be restricted, for which Officer Bemo requested an ambulance, removed Mr. Davis from the hot patrol car, allowed Mr. Davis to lean on the patrol car rather than sit on the sidewalk, made sure Mr. Davis received water, and eventually removed the handcuffs. These are reasonable accommodations under the circumstances.

Furthermore, Plaintiff has failed to show that Mr. Davis suffered greater injury or indignity than other arrestees. *Gohier v. Enright*, 186 F.3d 1216, 1220-21 (10th Cir. 1999). As discussed in the Court's Opinion and Order on Sergeant Jenkins' Motion for Summary Judgment, (Docket No. 74), there is no evidence in the record that establishes Mr. Davis suffered substantial harm as a result of Defendants' interactions with him. While Mr. Davis was seen at Wagoner Community Hospital on the evening of the incident complaining of pain and swelling to his fistula due to handcuffing, only soft tissue swelling was noted in his left wrist and Tylenol and ice were recommended for pain. (Docket No. 41-11 at 4). His fistula was noted as "in place with obvious thrill."[10] *Id.* at 5. Finally, despite Mr. Davis's own belief that he was "forced to undergo multiple surgeries to repair damage to his AV fistula," there is no evidence in the record to support this

---

[10] The evidence of "obvious thrill" in the medical records indicates there was adequate blood flow through the fistula.

assertion.[11] (Docket No. 50-4 at 7). Accordingly, the City is entitled to summary judgment as to Plaintiff's claims of ADA violations[12].

    IV.    Conclusion

For the foregoing reasons, the Court finds that Plaintiff has failed to present sufficient evidence to establish any genuine dispute of material fact as to her claims against the City of Muskogee. The record does not support a finding of any underlying constitutional violation by the individual officers, nor does it show a municipal policy or custom that caused a deprivation of Mr. Davis's rights, as required to establish *Monell* liability. Additionally, Plaintiff's state law negligence claims fail under the Oklahoma Governmental Tort Claims Act, as the evidence does not demonstrate that the officers acted negligently or that Mr. Davis sustained an injury proximately caused by their conduct. Finally, Plaintiff's ADA claim cannot survive summary judgment because the evidence shows that reasonable accommodations were made, and no injury or indignity greater than that experienced by other arrestees has been demonstrated. Accordingly, the City is entitled to summary judgment on all claims.

    IT IS SO ORDERED this 1st day of May, 2025.

                            _____

                            D. Edward Snow
                            United States Magistrate Judge

---

[11] Plaintiff argues that Mr. Davis's verified responses to Interrogatories, which indicate that as a result of the incident at issue he was "forced to undergo multiple surgeries to repair damage to his AV fistula" support his claim that his subsequent procedures were necessitated by Defendants' actions; however, Plaintiff also indicates that he is not a physician and therefore not qualified identify the damages caused by Defendants. (Docket No. 50-4 at 7). Plaintiff's counsel admitted at the oral hearing, that apart from this Interrogatory, there is no evidence to support Plaintiff's claim that Mr. Davis had to undergo additional surgeries as a result of being handcuffed on September 18, 2018.

[12] Plaintiff additionally makes a claim against the City for failure to train its officers on the ADA which resulted in Mr. Davis's injuries. However, as analyzed above, the Officers involved did make reasonable accommodations for Mr. Davis's known disabilities and therefore no violation for failure to train can be found.